575 S.E.2d 342

### Robert C. CARTER, On Behalf of Himself and a Class of Others Similarly Situated, Plaintiff,

v.

### MONSANTO COMPANY, A Foreign Corporation; Solutia, Inc., A Foreign Corporation; The City of Nitro, A West Virginia Municipal Corporation; Amherst Coal Company, A West Virginia Corporation; Arch of West Virginia, Inc., A West Virginia Corporation; Arch of Illinois, Inc., A Foreign Corporation; Apogee Coal Company, A Foreign Corporation, Defendants.

### No. 30651.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 13, 2002.

Decided Dec. 5, 2002.

Concurring Opinion of Justice Starcher Dec. 11, 2002.

Concurring and Dissenting Opinion of Justice McGraw Jan. 6, 2003.

Stuart Calwell, Esq., David H. Carriger, Esq., Law Offices of Stuart Calwell, PLLC, Charleston, for Plaintiff.

Charles M. Love, III, Esq., Phyllis M. Potterfield, Esq., Anthony P. Tokarz, Esq., Bowles Rice McDavid Graff & Love PLLC, Charleston, for Monsanto Company, Solutia, Inc., Amherst Coal Company, Arch of West Virginia, Inc., Arch of Illinois, Inc., and Apogee Coal Company.

David L. Yaussy, Esq., for Amicus Curiae, West Virginia Farm.

Bureau Edward J. George, Esq., for Amicus Curiae, West Virginia Manufacturers Association.

MAYNARD, Justice:

This case comes before us upon certification from the Circuit Court of Putnam County. By order entered on November 19, 2001, the circuit court presents the following question:

Does a common law cause of action exist in West Virginia for the recovery of the cost of future inspection and monitoring of real estate for the presence of toxic substances where it can be proven that such expenses are necessary and reasonably certain to be incurred as a proximate result of a defendant's tortious conduct in creating and maintaining a chemical dump and permitting toxic substances placed in said chemical dump to enter the waterways of this State to be deposited downstream upon the land of others through flooding thus exposing such land and its owner to toxic contamination?

Answer of the circuit court: No.

We have reviewed the record, briefs, and arguments submitted on appeal. After applying the law to the facts of this case, we agree with the circuit court and answer the certified question in the negative.

I.

FACTS

Robert Carter represents himself in this class action as well as all other similarly situated plaintiffs. The second amended complaint filed by Carter on May 29, 2001 alleges that he is a resident of Putnam County who owns and resides on property which abuts the surface waters of Manila Creek. He states that his property is located downstream from the Manila Creek landfill, and that other property owners reside downstream from either the Manila Creek landfill or the Hiezer Creek landfill.

Carter alleges that in 1929, the Monsanto Company (Monsanto) operated a chemical manufacturing plant in Nitro, West Virginia, and that Solutia, Inc. (Solutia) is the successor to certain liabilities of Monsanto. He asserts that beginning in 1948, Monsanto produced a herbicide, 2, 4, 5–trichlorophenoxyacetic acid, which resulted in the formation of a contaminant, 2, 3, 7, 8–tetrachlorodibenzoparadioxin, otherwise known as dioxin. Carter believes dioxin in this formulation is highly toxic. He further contends that Mon-

santo disposed of large quantities of waste material contaminated with dioxin at various locations including the Manila Creek landfill and the Heizer Creek landfill.

Carter alleges that the City of Nitro, at all relevant times, owned and controlled the Heizer Creek landfill. He contends that Nitro allowed Monsanto to dump toxic chemicals into the Heizer Creek landfill. Carter also alleges that Amherst Coal Company, at all relevant times, owned and controlled the Manila Creek landfill. He contends that Amherst allowed Monsanto to dump toxic chemicals into the Manila Creek landfill. He asserts that Arch of West Virginia, Inc. is a successor to the liabilities of Amherst. He believes that Arch of Illinois, Inc. is a successor to the liabilities of Arch of West Virginia, and that Apogee Coal Company is a successor to the liabilities of Arch of Illinois.

Carter alleges that during the 1980s, the United States Environmental Protection Agency required Monsanto to remove contaminants from both landfills. Despite these efforts, both landfills remain contaminated today and are sources of offsite contamination. Carter maintains that the surface water and sediment of Manila Creek, Heizer Creek, the Pocatalico River, and the Kanawha River are contaminated with dioxin. He states that Manila Creek, Heizer Creek, the Pocatalico River, and an unnamed tributary which flows from the Heizer Creek dump site periodically overflow their banks, thus flooding real property downstream and depositing contaminated sediment on adjoining property.

Based upon these allegations, Carter asserted four counts in his complaint: (1) property inspection/monitoring; (2) risk assessment and health monitoring; (3) interference with use and enjoyment of riparian property rights; and (4) diminution in value of riparian property rights. Monsanto and the landfill owners filed motions to dismiss the complaint. Following a hearing held on July 26, 2001, the circuit court granted the motion to dismiss as to count 1, property inspection/monitoring, and certified the aforementioned question to this Court. The motion to dismiss the claims constituting counts 2, 3, and 4 of the complaint was denied. The court further stayed all proceedings in this matter until we certify our answer back to circuit court.

## II.

### STANDARD OF REVIEW

██ " 'The appellate standard of review of questions of law answered and certified by a circuit court is *de novo.*' Syllabus point 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996)." Syllabus Point 2, *Keplinger v. Virginia Elec. and Power Co.*, 208 W.Va. 11, 537 S.E.2d 632 (2000).

## III.

### DISCUSSION

Carter contends the circuit court erred by answering the certified question in the negative and granting the motion to dismiss as it relates to count 1 of his complaint. He argues that Monsanto and the landfill owners should pay to quantify the amount of dioxin which exists on his property. In his brief, Carter essentially argues that medical monitoring which was instituted by this Court in *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424 (1999), should be expanded to include property monitoring. He states that he must test his property now, those tests are prohibitively expensive, and he has an interest in avoiding the cost of that testing. However, during oral argument, Carter's attorney appeared to abandon the property monitoring argument and instead focused on nuisance by arguing that Monsanto and the landfill owners interfered with Carter's peaceful enjoyment of his land. He argued that he has a "well-founded fear" of contamination which actually constitutes a present injury. When asked if any other state has recognized a "well-founded fear" as a separate cause of action, Carter's attorney admitted that he knew of none.

Monsanto and the landfill owners counter that unlike the present case, the *Bower* plaintiffs had been significantly exposed to a hazardous substance. The companies differentiate between *Bower* and this case by pointing out that Carter does not know if his property

has been exposed to a hazardous substance. Instead, Carter is seeking expense money to conduct testing to determine if his property has been damaged by exposure to dioxin; in essence, he is asking that the burden of the expense of gathering evidence, testing and sampling, be shifted to Monsanto and the landfill owners. The companies maintain that if Carter brings a private nuisance action and prevails, he will recover the costs of his expenses.[1] But the burden is his and he must first prove at his expense that his property has in fact been injured. We agree.

■ Neither West Virginia common law nor West Virginia statutory law presently supports or recognizes a claim for property monitoring. Carter does not support his claim for preliminary testing of his property with citations to West Virginia law or to citations from any other jurisdiction. In our judgment, the *Bower* opinion does not support his claim. In *Bower,* this Court established a method to allow recovery for future medical monitoring of individuals who suffered significant exposure to a hazardous substance and, consequently, suffer a significantly increased risk of developing a latent disease. In order to recover, a plaintiff must demonstrate that he or she has a significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure. In the case *sub judice,* Carter has not established that his property has been exposed to a hazardous substance. If he proves that exposure has occurred, he is not without a remedy under private nuisance law, as we will discuss *infra.* Under the facts of Carter's case, we decline to create a new cause of action for "property monitoring." We, therefore, hold that there is no common law cause of action in West Virginia for property monitoring.

During oral argument before this Court, Carter's attorney argued that our previous opinion, *Hendricks v. Stalnaker,* 181 W.Va. 31, 380 S.E.2d 198 (1989), takes this case out of the context of property monitoring and puts it into the context of nuisance. Carter's attorney also admitted that nuisance

law has not been expanded to permit recovery of preliminary expenses or costs for property testing from alleged tortfeasors. He, nonetheless, argued that he should be allowed to present evidence to a jury concerning Carter's "well-founded fear" of property contamination. Further, he argued, if the jury believes Carter's "well-founded fear" is justified, then the burden shifts and Monsanto and the landfill owners must pay for sampling and testing to determine if Carter's property is contaminated with dioxin. This argument is very original and creative, but it misconstrues nuisance law and would result in a fairly fundamental change in the manner in which nuisance litigation has been historically conducted in our courts.

■ This Court previously defined private nuisance by stating that " '[a] private nuisance is a substantial and unreasonable interference with the private use and enjoyment of another's land.' Syllabus point 1, *Hendricks v. Stalnaker,* 181 W.Va. 31, 380 S.E.2d 198 (1989)." Syllabus Point 4, *Quintain v. Columbia Natural Resources,* 210 W.Va. 128, 556 S.E.2d 95 (2001). Stated another way,

> A nuisance is anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable. . . . A nuisance is anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort. . . . A condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of persons in their homes is materially interfered with thereby.

*Hendricks,* 181 W.Va. at 33, 380 S.E.2d at 200 (citations omitted). The type of conduct that constitutes a private nuisance "includes conduct that is intentional and unreasonable, negligent or reckless, or that results in [ ] abnormally dangerous conditions or activities in an inappropriate place." *Hendricks,* 181 W.Va. at 33–34, 380 S.E.2d at 200.

1. We acknowledge and appreciate the amici curiae briefs filed by the West Virginia Farm Bureau and the West Virginia Manufacturers Association in support of Monsanto's and the landfill owners' position.

██ In order for an interference to be "substantial" or "significant," the interference must "involv[e] more than slight inconvenience or petty annoyance[,] ... there must be a real and appreciable invasion of the plaintiff's interests[.]" Restatement (Second) of Torts § 821F(c) (1979). Moreover, "[a]n interference with the private use and enjoyment of another's land is unreasonable when the gravity of the harm outweighs the social value of the activity alleged to cause the harm." Syllabus Point 2, *Hendricks, supra*.

██ In this case, Carter contends that the substantial interference with the private use of his property is a "well-founded fear" regarding the sanctity of peaceful enjoyment of his land. It is well-settled, however, that under private nuisance, fear alone is not a sufficient basis for recovery. "It has variously been said that liability for nuisance is a species of tort liability, and that a nuisance is a tort, which is governed by the rules relating to torts generally." 58 Am.Jur.2d *Nuisances* § 66 (1989). In other words, before one can recover under a tort theory of liability, he or she must prove each of the four elements of a tort: duty, breach, causation, and damages. Usually, the burden is on the plaintiff to prove the elements and to first suffer the expenditure of costs incurred to gather and put on the proof. However, if Carter brings a private nuisance action and prevails, he will recover any damages he has suffered, as well as costs.

Lastly, the plaintiff is not without aid or remedy for assistance in producing and gathering evidence in this case. We note that numerous federal and state agencies exist to which individuals may complain when they believe their property rights have been violated and their land or water contaminated. For instance, an air pollution complaint may be directed to the West Virginia Air Quality Board under Chapter 22, Article 5 of the West Virginia Code. The Air Quality Board's duties include, *inter alia*, making investigations to ensure compliance with the Federal Clean Air Act. W.Va.Code § 22–5–4(6) (1994). A water pollution complaint may be directed to the West Virginia Office of Water Resources which ensures compliance

with the Federal Water Pollution Control Act under Chapter 22, Article 11 of the West Virginia Code. The Office of Water Resources studies and investigates all problems concerning water flow and water pollution. W.Va.Code § 22–11–4(5) (1994). The Director of the Division of Environmental Protection is authorized to inspect and investigate all solid waste facilities in the State. Moreover, the Director may "enter any approved solid waste facility, open dump or property where solid waste is present and take samples of the waste, soils, air or water or may, upon issuance of an order, require *any person* to take and analyze samples of such waste, soil, air or water." W.Va.Code § 22–15–5(e) (1998) (emphasis added).

Further, hazardous waste is regulated under the Hazardous Waste Management Act, West Virginia Code Chapter 22, Article 18. Hazardous waste complaints are directed to the Division of Environmental Protection. The following statutory procedure controls these complaints:

(a) If the director determines, upon receipt of any information, that (1) the presence of any hazardous waste at a facility or site at which hazardous waste is, or has been, stored, treated or disposed of, or (2) the release of any such waste from such facility or site may present a substantial hazard to human health or the environment, he or she may issue an order requiring the owner or operator of such facility or site to conduct such monitoring, testing, analysis and reporting with respect to such facility or site as the director deems reasonable to ascertain the nature and extent of such hazard.

W.Va.Code 22–18–14(a) (1994). One can also complain to the Environmental Protection Agency. In an emergency situation, such as a flood, the Division of Environmental Protection initially conducts testing when it is deemed necessary for any reason whatsoever. The Federal Emergency Management Agency reimburses the Division for eighty percent of the expense associated with such testing. The record before us does not disclose whether Carter chose to seek assistance from any state or federal agency, al-

though it appears he has not sought their intervention or assistance.

Notwithstanding all the foregoing, we are sympathetic to Carter's problem. Any landowner would be sorely aggrieved to own property adjacent to landfills which contain hazardous chemicals and not know if those chemicals have contaminated his property. If indeed dioxin has escaped from the landfills and migrated onto his property, he has a very real and a very expensive problem. Even though he makes a sound and persuasive argument for property monitoring, such a creation cannot be the most practical or fairest remedy for his genuine concern. Accordingly, we must reject his request to expand our law to include this new cause of action. He has other avenues available to him which he may pursue. The certified question is answered in the negative.

Certified question answered.

STARCHER, Justice, concurring:
(Filed Dec. 11, 2002)

I write separately in concurrence to emphasize several aspects of the majority opinion and the underlying case.

First, as the majority opinion points out, these plaintiffs—independent of their other causes of action that were based on nuisance, etc.—pled a separate cause of action for property monitoring. The circuit court granted a motion to dismiss the separate property monitoring cause of action; and in so doing, posed and answered the certified question that was sent up to this Court.

I think that the circuit court was correct in dismissing the separate cause of action for property monitoring, for reasons that I will briefly outline.

As the majority opinion recognizes, the certified question as posed was confusing and inappropriate to the posture of the case as it stood in the lower court, where no discovery had taken place, etc., much less any findings made. The certified question appears to assume that the plaintiffs had already proven that their property was exposed to dangerous substances through the defendants' wrongdoing. At that point, the plaintiffs would have already made out a case of nuisance, and they would need no separate cause of action to invoke the remedial powers of the court, which as I point out *infra*, could include some form of monitoring or testing.

The cause of action for private nuisance has been for centuries a highly flexible one, giving courts substantial latitude to fashion appropriate and reasonable remedies, depending on the harm to be avoided or remedied. For example, a dangerous animal need not first escape and attack a child before a court can entertain a request to order the animal chained or a suitable fence built. And to draw an imperfect but useful parallel to the instant case, if such an animal did escape and bite someone, a court could certainly consider whether the cost of rabies tests should be paid by the animal's owner, even though the test results might be negative.

This leads me to my next point—that property monitoring (like medical monitoring, under my understanding) is not—repeat, IS NOT—a separate cause of action. In my view, monitoring and the cost thereof are simply a remedy or an element of damages that are available to a court to award or order against a culpable party. Therefore, to be complete and more accurate, the new syllabus point in the Court's opinion in the instant case should be read as holding that:

There is no common law cause of action in West Virginia for property monitoring that is separate and distinct from the established causes of action that protect interests in property, such as private nuisance and trespass.

Additionally, I would further clarify the Court's opinion by holding that:

Under the cause of action for private nuisance, a court may not as part of its judgment award against a defendant the cost of future inspection and monitoring of the plaintiff's real estate until and unless the plaintiff first establishes the fact of a nuisance by proving a past, existing, or likely future illegal or unreasonable interference with the enjoyment and use of the plaintiff's property by a defendant.

The plaintiffs in the instant case presented this Court with a "moving target" of shifting theories and requested rulings by this Court.

But all of their theories and requests came around to arguing that the defendants should have to pay "up front" for testing the plaintiffs' property—without any sort of prior showing by the plaintiffs that the defendants had used their property illegally or unreasonably, and that such use had resulted in tangible injuries or real threats to the plaintiffs' interests. For example, no expert opined that there was likely to be risk or harm to the plaintiffs' properties from the defendant's conduct. Nor did the plaintiffs produce the results of sample testing that could indicate the likelihood of more widespread contamination, and therefore the reasonableness of ordering testing of other properties. With the case in such a nebulous posture, this Court rightly ruled that the plaintiffs had the cart "way before" the horse.

Nevertheless, in the context of a preliminary injunction request, under the "balancing of the harms" test, one can imagine a scenario where a court might be justified in preliminarily requiring some form of monitoring by a nuisance defendant before final judgment on liability—such as where a strong preliminary showing of a highly unreasonable risk to others was made. Of course, if a plaintiff in such a case did not ultimately prevail, they would have to reimburse the defendant for the cost of the monitoring. However, this is not the sort of award of monitoring costs that the plaintiffs in the instant case are seeking.

I believe that the classic causes of action for trespass, nuisance, and negligence can and must be flexible enough to deal with the environmental challenges of our modern era. If a person or company disposes of poisons on their property, and those poisons are proven to be likely to migrate or to have migrated, through the air or water, to contact and contaminate other persons and/or their properties, then the poison disposer should be accountable in court to people whose persons or properties are actually threatened or contaminated. If the disposer can persuade a jury that their conduct and its likely and actual consequences is or was not unreasonable (a nuisance) or otherwise culpable, then there is no liability. But if such a disposer is proven to have culpably injured or placed people at substantial risk in their persons or property, then—in an appropriate case—a court *can* order the wrongdoer to pay for the cost of monitoring—to detect the extent of harm, to aid in the determination of damages and other remedies, and for the future protection of innocent victims of possible or actual contamination.

Nothing in the Court's opinion in this case precludes this sort of remedy. I therefore concur in the Court's judgment.

McGRAW, Justice, concurring in part and dissenting in part.

(Filed Jan. 6, 2003)

I concur with the majority in its decision that the plaintiff in this case already has an existing cause of action for nuisance or trespass, and that Mr. Carter, as the majority states, "has other avenues available to him which he may pursue."

Also, I agree whole-heartedly with the comments made by Justice Starcher in his concurring opinion, that under the right circumstances a court could require a defendant polluter to pay for the cost of testing a plaintiff's property for contaminants. Like Justice Starcher, I also believe that the certified question, as presented to this Court, was confusing.

I dissent because I believe that the certified question, and with it syllabus point one of this opinion, could be read to suggest that *even when a plaintiff prevails* in establishing that a defendant polluter has exposed his or her property to toxic contamination the plaintiff would not be entitled to the cost of monitoring for that contamination. I believe that our existing law clearly provides that a wrongdoer must pay for all the costs of his or her actions in such a case.

Furthermore, I believe that this case stands for a simple proposition, and one that we should not lose sight of. On the one hand we have a large corporation that operated a toxic waste dump and allegedly allowed odorless, tasteless, colorless, unsafe substances to escape and potentially contaminate the property of its neighbors. On the other hand we have local property owners who want to know if it is alright for their kids to play in the yard or safe to grow a few tomatoes in

the summer. It seems obvious to me that once a plaintiff has established that a defendant has exposed its neighbors to a substantial risk of contamination, the company should have to pay to determine if the neighbors' land is safe.

Therefore, I respectfully concur in part and dissent in part to the majority decision.