IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2024 Term

_____

No. 22-0207

_____

FILED

**June 6, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

SANDY K. HAYES,
Plaintiff Below, Petitioner,

v.

KANAWHA VALLEY REGIONAL TRANSPORTATION AUTHORITY,
a political subdivision; and
JOHN DOE bus driver, an employee of Kanawha
Valley Regional Transportation Authority,
Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Joanna I. Tabit, Judge
Civil Action No. 20-C-1013

AFFIRMED

_____

Submitted: March 13, 2024
Filed: June 6, 2024

Andrew D. Byrd, Esq.
Warner Law Offices, PLLC
Charleston, West Virginia
Woody Hill, Esq.
Woody Hill Attorneys at Law, PLLC
Charleston, West Virginia
Counsel for the Petitioner

Duane J. Ruggier II, Esq.
Evan S. Olds, Esq.
Pullin, Fowler, Flanigan, Brown &
Poe, PLLC
Charleston, West Virginia
Counsel for the Respondents

JUSTICE HUTCHISON delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law."  Syl. pt. 5, *Aikens v. Debow*, 208 W. Va. 486, 541 S.E.2d 576 (2000).

2.      "A common carrier is held to the highest degree of care, commensurate with reasonable foresight and judgment, for the safe carrying of its passengers.  The slightest degree of negligence causing them injury renders the carrier liable."  Syl. pt. 2, *Bartley v. W. Maryland Ry. Co.*, 81 W. Va. 795, 95 S.E. 443 (1918).

3.      "Although a common carrier is not an insurer of its passengers' safety, where the fare-paying relationship exists, the carrier owes the passenger the duty to use the highest degree of care compatible with the practical operation of a vehicle."  Syl. pt. 2, *Abdulla v. Pittsburgh & Weirton Bus Co.*, 158 W. Va. 592, 213 S.E.2d 810 (1975).

4.      A common carrier owes the highest degree of care to a passenger who is in the act of boarding, is upon, or is in the act of disembarking from, the carrier's vehicle.

5.      Once a passenger safely and freely disembarks from a common carrier's vehicle at his or her chosen destination, the carrier's contract to safely transport the passenger ends and the former passenger assumes the status of a pedestrian.  From that point, the carrier owes the former passenger only a duty of ordinary care.

**HUTCHISON, Justice**:

In this appeal from the Circuit Court of Kanawha County, we assess what duty of care is owed by a common carrier to an individual who has safely exited the carrier's vehicle. In this case, plaintiff-petitioner Sandy K. Hayes was a passenger on a bus operated by the defendant-respondent Kanawha Valley Regional Transportation Authority ("KRT"). After she exited the bus onto the roadside, and the bus began to pull away, Ms. Hayes crossed the road and was struck by another vehicle. Ms. Hayes sued and argued that KRT breached its duty to use the "highest degree of care" toward her. The circuit judge disagreed and granted summary judgment to KRT, finding no evidence of any duty that was breached.

We affirm the circuit judge. As we discuss below, only passengers entering, riding in, or disembarking from a common carrier's vehicle are entitled to an exacting, high standard of care. We find that once Ms. Hayes safely and freely disembarked from KRT's vehicle, KRT's contract to transport her as a passenger for hire ceased and she became a pedestrian. At that point, KRT owed Ms. Hayes only the more relaxed duty of ordinary care owed to every pedestrian, and Ms. Hayes offered no evidence that duty was breached.

## I. Factual and Procedural Background

It was barely dark on the evening of October 14, 2019, when Ms. Hayes and a friend got on a bus operated by KRT in downtown Charleston. Ms. Hayes's destination was her home at the Elk Crossing Apartment Complex on Frame Road in Elkview. As the

1

bus turned on to Frame Road and headed roughly north, a black sedan driven by Taylor Jenkins turned out of a Go-Mart gas station at the north end of Frame Road and headed south.

Frame Road is a two-lane highway with a fifty-mile-per-hour speed limit. As the bus passed what is now the entrance to Herbert Hoover High School,[1] Ms. Hayes pulled the rope to tell the bus driver to stop. The bus stopped in the middle of the northbound lane, across from Ms. Hayes's apartment complex. Camera footage from the bus shows Ms. Hayes exiting the bus as she said to the driver, "Home sweet home." Ms. Hayes's friend also exited the bus.

To reach her apartment, Ms. Hayes needed to walk across Frame Road. Installed on the bus was an instructional sign that provided, among other things: "Do not cross in front of bus. When crossing behind bus, wait until bus has moved far enough for you to see on-coming traffic." Ms. Hayes later testified, "I don't normally wait, I just go across."

As the KRT bus stopped, a witness and her husband stopped their vehicle behind the bus. They saw Ms. Hayes and her friend exit the bus, walk along the edge of the road to the back of the bus, look to see if any cars were coming from either direction, then begin to cross the road as the bus pulled away. Camera footage from the bus shows

---

[1] It bears noting that this case was argued on the LAWS (Legal Advancement for West Virginia Students) docket before students at Herbert Hoover High School.

that, fourteen seconds after Ms. Hayes exited, Ms. Jenkins's car approached and passed the bus in the opposite lane.

The witness in the vehicle behind the bus saw a car in the opposing lane coming "extremely quick" toward Ms. Hayes and her friend, and the witness said to her husband, "I don't think that car is going to stop." Ms. Hayes and her friend picked up their pace, with the friend about three steps ahead of Ms. Hayes. Unfortunately, the right side of Ms. Jenkins's car clipped Ms. Hayes and knocked her off her feet. As a result of the impact, Ms. Hayes had fractures to numerous bones in her pelvis, right leg, and right knee, and was taken to the hospital for treatment where she stayed for nine days.[2] Ms. Hayes testified that she continues to have pain from her injuries.

Ms. Hayes retained lawyers who secured a settlement from Ms. Jenkins and her insurer. Ms. Hayes then filed this lawsuit in November 2020 against KRT (and its then-unknown bus driver whom she identified as "John Doe") alleging that the KRT bus driver was negligent in his operation of the bus and that his actions caused or contributed to her injuries.

---

[2] Ms. Jenkins did not stop and fled from the scene. However, a sheriff's deputy recovered pieces of her car from the road (the plastic trim cover of her fog light was sufficient to identify the make and model of the car), as well as video footage from the bus and the Go Mart. After surrendering to authorities the next day, Ms. Jenkins claimed she did not stop because she had only seen a "flash" and assumed she had hit a deer.

After the parties completed discovery, Ms. Hayes filed a motion for partial summary judgment. She argued that KRT knew it had violated its highest duty of care to ensure that passengers could exit its buses in a safe environment and cited to deposition testimony from several KRT employees. KRT's director of operations testified that bus drivers "have a duty to ensure that passengers exit their buses into a safe environment[.]" A KRT operations supervisor similarly testified that if a bus driver "sees that a stop is unsafe, they are not to let an individual off at that location. They're to let them off at the nearest location." Finally, the bus driver (who was identified in discovery as Daniel Taylor) gave his opinion that Ms. Hayes's stop was not "the safest place" because "you're out on the road in a 50-mile-an-hour speed zone . . . there's no street lights or nothing[.]" Bus driver Taylor stated, however, that it was not the duty of a bus driver to see that passengers who have left the bus "cross the road safely. It's [the passenger's] job to cross the road. It's not our job. Once they're off the bus, we're not responsible for them."

In sum, Ms. Hayes argued to the circuit judge that there was no factual question in the record for a jury that KRT violated its duty of the highest care, because the bus driver himself testified that the stop was not "the safest place."

KRT filed a motion for summary judgment on all counts. KRT pointed out that the facts did not show Ms. Hayes was injured as she exited the bus onto an unsafe spot, but rather showed she was injured crossing the road after successfully exiting the bus. KRT argued that it had no legal duty, as a matter of law, to assist or control what Ms. Hayes did after she safely exited the bus, or, more specifically, no duty to direct how or where she

4

chose to cross the road after she exited the bus. Stated succinctly, KRT asserted that Ms. Hayes failed to establish KRT owned her *any* duty once she alighted from the bus.

After hearing arguments and asking the parties for several rounds of briefs, the circuit judge entered an order on February 18, 2022, that both denied Ms. Hayes's motion and granted KRT's motion. The circuit judge dismissed Ms. Hayes's position because she was not injured as she "alighted" and exited the bus. She was not in danger from or injured by any condition at the stop; instead, she placed herself in danger when she chose to cross the road without verifying the roadway was clear. The circuit judge also found that Ms. Hayes offered no statute, regulation, or case law that imposed a duty of care on a bus company to look after passengers after they have safely exited from a bus. Thus, the circuit judge determined that "KRT did not have a duty to [Ms. Hayes] after she flagged the stop, exited the bus, the bus pulled away, and she crossed the road . . . and was struck by a vehicle in a hit-and-run." The circuit judge also ruled that after Ms. Hayes left the bus, KRT "did not know where she was going and did not control where she went or the path she took to get there."

A plaintiff's first step in any negligence lawsuit is proof of a duty that was breached by the defendant. Based on the record made by the parties, the circuit judge found that KRT owed Ms. Hayes no high duty of care after she exited the bus and found no factual disputes remaining for a jury to resolve. Accordingly, in the absence of a duty, the circuit judge found all of Ms. Hayes's claims against KRT and its bus driver failed and granted summary judgment in KRT's favor.

5

Ms. Hayes now appeals the circuit court's February 18, 2022, order.

## II. Standard of Review

When a litigant appeals a judge's order granting summary judgment, this Court will review the order "*de novo*." *Broderick v. Big Bear Lake Prop. Owners Ass'n, Inc.*, No. 12-1087, 2013 WL 3184664, at \*1 (W. Va. June 24, 2013) (memorandum decision).[3] This simply means that we will "give a new, complete and unqualified review to the parties' arguments and the record before the circuit court." *Blackrock Cap. Inv. Corp. v. Fish*, 239 W. Va. 89, 96, 799 S.E.2d 520, 526 (2017). The barrier we apply is the same as that applied by a circuit judge: "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *Pennington v. Bear*, 200 W. Va. 154, 156-57, 488 S.E.2d 429, 431-32 (1997).[4]

## III. Discussion

We begin by stating the axiom every barrister knows is the foundation of the law of negligence. "In any negligence or tort case, a plaintiff is required to show four basic

---

[3] *Quoting* Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*.").

[4] *Quoting* Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

elements: duty, breach, causation, and damages." *Gable v. Gable*, 245 W. Va. 213, 225,

858 S.E.2d 838, 850 (2021). We have explained these four elements this way:

> The plaintiff must prove that the defendant owed the plaintiff
> some duty of care; that by some act or omission the defendant
> breached that duty; and that the act or omission proximately
> caused some injury to the plaintiff that is compensable by
> damages. When we say that a defendant is "negligent," we are
> merely saying the defendant owed some duty of care to another
> yet failed to abide by that duty.

*Hersh v. E-T Enter., Ltd. P'ship*, 232 W. Va. 305, 310, 752 S.E.2d 336, 341 (2013).[5]

In this case, we focus on the first element: whether the plaintiff (Ms. Hayes)

established that the defendant (KRT) owed her some legal duty after she disembarked from

the bus. In any negligence case, whether a duty exists, and the form of that duty, are

overbearing questions of law which must be decided by a judge.

> The determination of whether a defendant in a particular
> case owes a duty to the plaintiff is not a factual question for the
> jury; rather the determination of whether a plaintiff is owed a
> duty of care by a defendant must be rendered by the court as a
> matter of law.

---

[5] *See also Carter v. Monsanto Co.*, 212 W.Va. 732, 737, 575 S.E.2d 342, 347 (2002) ("[B]efore one can recover under a tort theory of liability, he or she must prove each of the four elements of a tort: duty, breach, causation, and damages."); Syl. pt. 3, *Alexander v. Jennings,* 150 W.Va. 629, 149 S.E.2d 213 (1966) ("To recover in an action based on negligence the plaintiff must prove that the defendant was guilty of primary negligence and that such negligence was the proximate cause of the injury of which the plaintiff complains."); *Webb v. Brown & Williamson Tobacco Co.,* 121 W.Va. 115, 118, 2 S.E.2d 898, 899 (1939) ("In every action for damages resulting from injuries to the plaintiff, alleged to have been inflicted by the negligence of the defendant, it is incumbent upon the plaintiff to establish, by a preponderance of the testimony, three propositions: (1) A duty which the defendant owes to him; (2) A negligent breach of that duty; (3) Injuries received thereby, resulting proximately from the breach of that duty.").

Syl. pt. 5, *Aikens v. Debow*, 208 W. Va. 486, 541 S.E.2d 576 (2000). "If the plaintiff fails to establish the existence of a duty of care owed by the defendant to the plaintiff, then no case of prima facie negligence can be established" and summary judgment is proper. *Jack v. Fritts*, 193 W. Va. 494, 498, 457 S.E.2d 431, 435 (1995).

The general duty of a "public" or "common" carrier, such as a bus operator, is that the carrier owes to its passengers the highest degree of care and safekeeping while they are entering, riding, or alighting from one of its buses.[6] This duty is imposed on common carriers

> primarily because the passenger relies on the carrier for safe transport, and is not in a position to check out the quality of the carrier's equipment and personnel. . . . [The high burden of care also exists] because the public highways are often hazardous places, with heavy traffic and slippery, broken, or otherwise dangerous road surfaces[.]"

---

[6] Our decision bears upon common carriers of fare-paying passengers and not upon organizations operating school buses. Those organizations are held to a broader standard of care, one beyond the parameters of this case. *See, e.g.*, Jay M. Zitter, *Liability of Motorbus Carrier or Driver for Death of, or Injury to, Discharged Passenger Struck by Other Vehicle*, 16 A.L.R.5th 1, § 2[a] (1993) ("An even higher degree of care is imposed on schoolbus drivers, because of the nature of young children to be careless in crossing streets, and because of the difficulty in seeing such children in time for drivers to stop. Such duty may require the busdriver to perform extraordinary actions of care, such as stopping in a particular location, or warning or supervising the children."); Russell L. Wald, *Liability of School Bus Driver or School for Injury to Child Going to or from School Bus*, 13 Am. Jur. Proof of Facts 3d 475, § 4 (1991) ("A considerable number of cases have permitted recovery against school entities, school bus owners, and school bus drivers for injuries or death suffered by schoolchildren struck by passing motor vehicles while going to or after alighting from a school bus, as a result of the bus driver's negligence.").

Jay M. Zitter, *Liability of Motorbus Carrier or Driver for Death of, or Injury to, Discharged Passenger Struck by Other Vehicle*, 16 A.L.R.5th 1, §2[a] (1993). The cases in West Virginia discussing this duty are legion, stretch back nearly a century-and-a-half, and range from cases involving buses to those with trains, trolleys, and taxis.[7] As the

[7] Examples of cases bearing upon the "highest degree of care" required by common carriers toward their fare-paying passengers are exhaustive and instructive (notwithstanding that many incorporate now-abandoned principles of contributory negligence that are the forebearers of modern-day comparative negligence) and include *Jones v. Perrine*, 175 W. Va. 111, 113, 331 S.E.2d 842, 844 (1985) (this Court has approved jury instructions "which provided . . . 'that the law holds public carriers liable for the slightest negligence'" or which utilized "'highest degree of care' language in common carrier tort actions, often in conjunction with 'slightest negligence' language."); Syl. pt. 2, *Laphew v. Consol. Bus Lines*, 133 W. Va. 291, 55 S.E.2d 881 (1949) ("Where the relation of common carrier and passenger exists, the carrier owes to the passenger the duty to use the highest degree of care compatible with the practical operation of a vehicle."); Syl., *Bennett v. Bartlett*, 110 W. Va. 478, 158 S.E. 712 (1931) ("It is now a settled rule that the owner of a motor bus operated as a common carrier, owes to passengers for hire the duty to exercise for their safety the highest degree of care which is consistent with the practical operation of the vehicle. *The highest degree of care*, however, is not an absolute but a relative phrase. It does not imply continuity of the most perfect human care, but the highest degree of care which a man of ordinary prudence would bestow under similar circumstances."); Syl. pt. 4, in part, *Venable v. Gulf Taxi Line*, 105 W. Va. 156, 141 S.E. 622 (1928) ("[A] passenger is entitled at the hands of the carrier or its agent to the utmost care and diligence *compatible with the practicable operation of the vehicle*[.]"); Syl. pt. 2, *Perkins v. Monongahela Valley Traction Co.*, 81 W. Va. 781, 95 S.E. 797 (1918) ("Carriers of passengers in the execution of their contracts of carriage are charged with the exercise of the highest degree of care and diligence of which human skill and foresight is capable."); *Duty v. Chesapeake & Ohio Ry. Co.*, 70 W. Va. 14, 16-17, 73 S.E. 331, 333 (1911) (railroad company had a duty "to use all due and proper care, caution, skill and diligence in and about the operation and movement of its locomotives, engines, cars, coaches and trains and so forth, so as to prevent and avoid all hurts, injuries, accidents, and dangers to plaintiff, and to carry her safely and securely to [her] destination[.]"): Syl. pt. 1, *Kennedy v. Chesapeake & Ohio Ry. Co.*, 68 W. Va. 589, 70 S.E. 359 (1911) ("Though a railway company is not an insurer beyond what the utmost care, human skill, diligence and foresight can provide against, yet the slightest negligence on its part is regarded gross negligence, rendering it liable for injuries sustained by a passenger, in consequence of such negligence."); Syl. pt. 1, *Mannon v. Camden Interstate Ry. Co.*, 56 W. Va. 554, 49 S.E.

Continued . . .

Illinois Supreme Court opined, "The passenger to whom the carrier owes the duty to exercise the highest degree of care is one who is in the act of boarding, is upon, or is in the act of alighting from, the carrier's vehicle." *Katamay v. Chicago Transit Auth.*, 289 N.E.2d 623, 625 (Ill. 1972).

This general duty owed by a common carrier is not, however, unqualified. While common carriers must exercise the highest possible degree of vigilance, care, and precaution for the safety of those whom they transport, they are not insurers of every injury to their passengers. "The obligation of carrier to passenger does not run into the range of unreasonableness or impossibility." Syl. pt. 6, *Trippett v. Monongahela W. Penn Pub. Serv. Co.*, 100 W. Va. 319, 130 S.E. 483 (1925). Instead, a plaintiff is required to offer proof there has been some measure of a breach of the carrier's duty, what is sometimes

---

450 (1904) ("an unsophisticated country boy from the state of Ohio" was injured by broken trolley wire; held, the trolley company could be liable, because "[s]treet railway companies for the protection of their passengers, are bound to exercise extraordinary care and the utmost skill, diligence and human foresight in keeping in repair the necessary appliances used by it in the transportation of such passengers, and the slightest negligence on its part renders it liable for all accidents to such passengers occasioned thereby."); Syl. pt. 9, in part, *Carrico v. W. Va. Cent. & Pa. Ry. Co.*, 35 W. Va. 389, 14 S.E. 12 (1891) ("[I]n the transportation of its passengers a railroad company is bound to exercise more than ordinary care and diligence, and is liable for the slightest negligence against which prudence and foresight could have guarded . . . . Consequently the degree of care exacted from the company for a passenger is greater than that to be exercised in respect to a stranger or a trespasser."); Syl. pt. 3, in part, *Searle's Adm'r v. Kanawha & Ohio Ry. Co.*, 32 W. Va. 370, 9 S.E. 248 (1889) ("[T]he law, in tenderness to human life and limbs holds railroad companies liable for the slightest negligence and compels them to repel by satisfactory proofs every imputation of such negligence. When carriers undertake to convey passengers by the powerful but dangerous agency of steam, public policy and safety require, that they be held to the greatest possible care and diligence.").

called "the slightest degree of negligence." The typical formulation of this limiting rule says that "[a] common carrier is held to the highest degree of care, commensurate with reasonable foresight and judgment, for the safe carrying of its passengers. The slightest degree of negligence causing them injury renders the carrier liable." Syl. pt. 2, *Bartley v. W. Md. Ry. Co.*, 81 W. Va. 795, 95 S.E. 443 (1918). Stated another way, "[a]lthough a common carrier is not an insurer of its passengers' safety, where the fare-paying relationship exists, the carrier owes the passenger the duty to use the highest degree of care compatible with the practical operation of a vehicle." Syl. pt. 2, *Abdulla v. Pittsburgh & Weirton Bus Co.*, 158 W. Va. 592, 213 S.E.2d 810 (1975).

Courts nationwide agree that "[a] common carrier owes a duty to a passenger to provide a reasonably safe place to board and disembark its vehicle." 14 Am. Jur. 2d *Carriers* § 908 (2020). We too have said common carriers "are charged with the highest degree of care receiving and discharging passengers." Syl. pt. 2, in part, *Cain v. Kanawha Traction & Elec. Co.*, 81 W. Va. 631, 95 S.E. 88 (1918). We have applied the former part of this rule and found that common carriers have a high duty of care toward passengers as they enter a vehicle.[8]

---

[8] *See, e.g.*, Syl. pt. 7, *Normile v. Wheeling Traction Co.*, 57 W. Va. 132, 49 S.E. 1030 (1905) ("Where a street car company stops its cars for the purpose of receiving passengers, it is charged with the highest degree of care to see that all passengers lawfully entering its cars get to a place of safety thereon before starting its cars." Passenger was seriously injured when, after she took one step off the ground and on to trolley entrance, trolley jerked and began moving; woman grabbed a handle but slipped off the trolley and was dragged about 30 feet before falling to the ground.); Syl. pt. 8, *Duty v. Chesapeake &*

Continued . . .

11

The parties in this case dispute what duty a bus operator owes to a passenger who has exited the vehicle. The law is clear that common carriers have a high duty of care toward passengers while they are in the act of exiting the vehicle.[9] "The general law among

*Ohio Ry. Co.*, 70 W. Va. at 15, 73 S.E. at 331 ("It is actionable negligence for a conductor or other servant of a railroad company to start a train while passengers are obviously in the act of getting on it, or alighting therefrom." Passenger was thrown from train when it "suddenly and quickly and without warning started and jerked forward" as she was climbing stairs to enter car). Note, however, that common carriers do not have a high duty of care to individuals merely waiting for a conveyance. *See* Syl. pt. 1, *Adkins v. Raleigh Transit Co.*, 127 W. Va. 131, 31 S.E.2d 775 (1944) ("A person with intention to become a passenger of a motor bus, used as a public carrier, upon its arrival at a regular bus stop on a public street does not, merely by awaiting the arrival of the bus threat, become a passenger of the carrier; and in the absence of such relationship the carrier owes such person no higher duty than the exercise of reasonable care for such person's safety compatible with the practicable operation of the bus." While waiting at a crowded bus stop, plaintiff's foot was run over by a bus after he was shoved from the sidewalk). Only when the carrier has accepted the person as a passenger is the higher duty of care triggered. *See* Syl. pt. 1, *Kidwell v. Chesapeake & Ohio Ry. Co.*, 71 W. Va. 664, 77 S.E. 285 (1913) ("The relation of passenger and carrier begins when one presents himself at a passenger station of the carrier, in readiness to be transported to his destination, under such circumstances of time, place, manner, and condition that the carrier must be deemed to have accepted him as a passenger." Passenger was assaulted by railroad employee on railway's platform awaiting train after buying ticket.).

[9] *See, e.g.*, Syl. pt. 4, *Bartlett v. Baltimore & Ohio R.R. Co.*, 84 W. Va. 120, 99 S.E. 322 (1919) ("In the performance of its duty, a carrier of passengers must stop its train at a station to which a passenger is destined, and keep the same stationary a sufficient length of time to allow him to alight therefrom in safety." As train slowed at station and railroad employee announced the station, passenger stood and moved down aisle to disembark; train "suddenly and violently moved" throwing passenger forward to the floor where he was injured.); Syl. pt. 2, *Guerin v. Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co.*, 72 W. Va. 725, 79 S.E. 739 (1913) ("A railroad company is liable to a passenger who, without fault on his part, is injured, while attempting to alight, by the starting and sudden stopping of the train, after it had stopped at his destination to let off and take on passengers, but not long enough to give him a reasonable opportunity to get off." Passenger was about to go down steps of train when it jerked, slamming her into the railing.). *See also Woodard v. Saginaw City Lines, Inc.*, 112 N.W.2d 512, 513 (Mich. 1961) ("[T]he bus company has a duty to discharge its passengers at a reasonably safe place."); *Chesapeake*

Continued . . .

12

American jurisdictions holds that a carrier has an affirmative duty to discharge a passenger in a reasonably safe place." *Burton v. Des Moines Metro. Transit Auth.*, 530 N.W.2d 696, 699 (Iowa 1995). "This heightened standard of care continues until the carrier has given its passenger a reasonably safe discharge at a reasonably safe location." *Mastriano v. Blyer*, 779 A.2d 951, 954 (Me. 2001). Hence, court cases show that passengers injured as they exited a conveyance at an unreasonably unsafe location, such as one covered in oil

---

*& Ohio R.R. Co. v. Smith*, 49 S.E. 487, 488 (Va. 1905) (railway conductor discharged plaintiff fifty yards from depot in the dark, and after alighting train plaintiff immediately fell into four-foot-deep cattle guard); 14 Am. Jur. 2d Carriers § 910 ("the carrier must exercise the highest degree of care or at least care commensurate with the circumstances so as to protect a passenger who is alighting from being injured by falling or otherwise; this heightened standard of care continues until the carrier has given its passenger a reasonably safe discharge at a reasonably safe location."); *Liability of Motorbus Carrier or Driver for Death of, or Injury to, Discharged Passenger Struck by Other Vehicle*, 16 A.L.R.5th at 1 ("Bus passengers expect that in return for the price of the fare, they will not only be taken to their destinations safely, but will also be let off in such a place that they can continue on their journeys without mishap.").

and grease,[10] or ice and snow;[11] next to a hidden ditch;[12] or (as discussed at oral argument) near wild animals like bears,[13] have established the common carrier breached its heightened duty of care.

Nevertheless, we are not persuaded to adopt Ms. Hayes's position that KRT owed her a heightened duty of care. The undisputed facts show that at the time she was injured, Ms. Hayes was not exiting the bus; instead, she had safely left the bus behind and was choosing a path across a highway. We likewise are not persuaded by KRT's argument

---

[10] *Newcomb v. New York Cent. & H.R.R. Co.*, 81 S.W. 1069, 1074 (Mo. 1904) (Railroad liable after porter told plaintiff to "jump off" slow-moving train; plaintiff landed on incline covered in oil or grease. Plaintiff's leg required amputation when he slid off incline and under train.). *But see Jones v. Perrine*, 175 W. Va. at 112, 331 S.E.2d at 843 (After consuming "an unspecified quantity of beer," plaintiff exited taxi at his apartment building and "slipped and fell on an oil deposit apparently left by vehicles that parked on the building's parking lot." Jury found no negligence by taxi company.).

[11] *Compare Woodard v. Saginaw City Lines, Inc.*, 112 N.W.2d at 513 (bus company liable when plaintiff was injured stepping off bus into piled up snow and ice blocking sidewalk) and *Homa v. Wilkes-Barre Transit Corp.*, 147 A.2d 377, 378 (Pa. 1959) (bus company could be liable after plaintiff was injured taking one step off bus and "lost traction on the ice-encrusted surface") *with Saab v. Omaha & Council Bluffs St. Ry. Co.*, 102 N.W.2d 59 (Neb. 1960) (bus company not liable when plaintiff safely exited bus and, instead of walking path seventeen to thirty feet to sidewalk, was injured when she chose to climb twelve to eighteen inch high pile of snow).

[12] *Chesapeake & Ohio Ry. Co. v. Harris*, 49 S.E. 997, 997 (Va. 1905) (plaintiff exited train onto railroad ties in the dark, took one step off the ties and fell into thirteen-foot-deep ditch).

[13] *See generally Restatement (Second) of Torts* § 314A, cmt. d (1965) (providing that "[a] common carrier is under a duty to its passengers to take reasonable action . . . to protect them against unreasonable risk of physical harm," and that this "extends also to risks arising from forces of nature or animals[.]").

14

that it owes absolutely no duty of care to individuals after they exit a bus. To the contrary, legal authorities are clear that once a person safely disembarks from a common carrier's vehicle, the person becomes a pedestrian to whom the common carrier owes an ordinary duty of reasonable care.[14] As one court explained,

[14] Syl. pt 1, in part, *Twyman v. Monongahela W. Penn Pub. Serv. Co.*, 118 W. Va. 330, 191 S.E. 541 (1937) (applying now-defunct principles of contributory negligence, but holding: "Where a passenger alights, in safety, from a street car, . . . he must exercise reasonable care for his own safety after he has reached the street; and a failure to exercise such care is negligence on his part as will bar recovery for injuries sustained by him in crossing the street from the car to the street curb."). *See also Barravecchio v. New York City Transit Auth.*, 922 N.Y.S.2d 96, 98 (2011) ("NYCTA's duty of care to its passengers terminates once they alight safely from the bus."); *Moore ex rel. Moore v. Bi-State Dev. Agency*, 87 S.W.3d 279, 287 (Mo. Ct. App. 2002) ("Once a passenger has a reasonable opportunity to reach a place of safety, the carrier only has a duty of ordinary care."); *Poe v. City of Detroit*, 446 N.W.2d 523, 527 (Mich. Ct. App. 1989) (cleaned up) ("[A] common carrier has no duty to warn passengers of the danger of traffic on a city street. Further, once the passenger safely alights, the special carrier-passenger relationship ends and the passenger becomes an ordinary pedestrian."); *Crutchfield v. Yellow Cab Co.*, 545 N.E.2d 961, 963 (Ill. 1989) (cleaned up) ("[A] common carrier . . . owes its passengers the highest degree of care while they are leaving a bus, and . . . the duty continues until passengers have a reasonable opportunity to reach a place of safety. Once that has occurred, the carrier then has only a duty of ordinary care."); *Heger v. Trustees of Indiana Univ.*, 526 N.E.2d 1041, 1043 (Ind. Ct. App. 1988) (cleaned up) (The duty of a common carrier "includes the duty of exercising reasonable care in furnishing passengers with a reasonably safe place for them to alight. On the other hand, a carrier generally is not liable for injuries received by a passenger who is struck by another vehicle after safely alighting from the carrier."); *Swendra v. Oc-Unk, Inc.*, 522 N.Y.S.2d 64 (App. Div. 1987) ("A common carrier's duty to its passenger is discharged when it affords the passenger a safe place to alight."); *Johnson v. Cravens*, 476 N.E.2d 1073, 1075 (Ohio Ct. App. 1984) ("The plaintiff was indisputably afforded a safe place to enter and exit the bus. The hazard he encountered was after he voluntarily left the safety of the bus, and its immediate environs, dashed in front of the bus and out into an intersection where he was struck by the Cravens' automobile. At that point, there is authority which holds that the carrier-passenger relationship had ceased, *eo instanti*, upon alighting safely."); *Staloch v. Belsaas*, 136 N.W.2d 92, 98 (Minn. 1965) ("[U]nder ordinary circumstances when a bus driver discharges his passengers in a reasonably safe place the relationship of passenger and carrier ceases therewith."); *Cooke v. Elk Coach Line*, 180 A. 782, 784 (Del. Super. Ct.

Continued . . .

15

> once a passenger freely disembarks at his chosen destination free from harm, his status as passenger, and the public carrier's contract to transport for hire, cease.  At that point the public carrier only owes such person the duty of ordinary care – it is under no duty to warn the former passenger of a danger which is apparent, obvious, and known to every person in good mind and sense, nor to personally transport, convey, or assist the former passenger in crossing a street or highway.

*Teer v. Cont'l Trailways, Inc*., 341 So. 2d 1306, 1308 (La. Ct. App. 1977) (cleaned up).

Another court said more succinctly that "[o]nce the passenger safely alights, the carrier/passenger relationship ends and the carrier's duty to the passenger resulting from the carrier/passenger relationship ceases." *Burton v. Des Moines Metro. Transit Auth.*, 530 N.W.2d at 699.  The reasoning behind this rule is that:

> Courts have been reluctant to hold common carriers liable for injuries to passengers caused by vehicles moving in traffic after the passenger safely alights.  The rationale for this rule is that after alighting, the passenger's individual choice directs where

---

1935) ("[T]he plaintiff was afforded a safe place upon which to alight and did alight safely on the sidewalk of the street.  From that moment the defendant had no control over her movements or over provisions for her safety.  The relation of carrier and passenger ceased, and the plaintiff assumed the status of a pedestrian."); *Waldron v. Sw. Bus Co*., 182 N.E. 596, 596 (Ohio 1930) ("The defendant company, while she was a passenger, owed her a high degree of care for her safety, but she alighted from the bus in a place of safety and the relation of carrier and passenger thereupon terminated.  The proximate cause of her subsequent injury was either her own negligence in walking in front of an approaching automobile, or the negligence of the operator of such automobile, and the defendant was in no sense responsible for the injury resulting therefrom."); *Ruddy v. Ingebret*, 204 N.W. 630, 630 (Minn. 1925) ("Under ordinary conditions . . . an adult passenger on a street car ceases to be such when at the end of his trip he steps from the car onto the street."). *See generally* Dewitt C. Blashfield, et al., *Duty of Carrier to Alighting Passengers—After Passenger Alighted*, 5 Blashfield Automobile Law and Practice § 202:9 (2023) ("As a general rule, once a passenger has alighted and reached a safe position the carrier owes only the same duty owed to any pedestrian, absent any special circumstance which may be deemed to require added care. . . . Thus, the carrier is generally not liable where the former passenger is injured on the roadway after alighting from the conveyance.").

> he or she will walk, the passenger is in a better position to guard against the dangers of moving vehicles, and common sense, logic, and public policy simply do not support extending a duty of care to the public carrier to insure that once the passenger has safely departed, the city's streets or sidewalks will be absolutely free from defect.

*Id.* (cleaned up).

Considering these authorities, we hold that a common carrier owes the highest degree of care to a passenger who is in the act of boarding, is upon, or is in the act of disembarking from, the carrier's vehicle. However, once a passenger safely and freely disembarks from a common carrier's vehicle at his or her chosen destination, the carrier's contract to safely transport the passenger ends and the former passenger assumes the status of a pedestrian. From that point, the carrier owes the former passenger only a duty of ordinary care.

Accordingly, we find the circuit court's conclusion that KRT did not owe a high duty of care to Ms. Hayes at the time she was injured was correct. KRT's high duty of care ended when Ms. Hayes safely disembarked from the bus. She left the bus at a site of her own choosing, and she was not injured as she exited. From that moment, KRT owed Ms. Hayes no duty other than that of ordinary care toward a pedestrian. When the bus pulled away, Ms. Hayes was a pedestrian who chose where, when, and how to cross the

road to her apartment. And finally, Ms. Hayes has offered no evidence that KRT breached its ordinary duty of care.[15]

## IV. Conclusion

In light of the foregoing discussion, we find no error in the circuit judge's decision to grant summary judgment in favor of KRT. Ms. Hayes failed to identify a duty of care owed to her that was breached by KRT. Accordingly, the circuit judge's order of February 18, 2022, is affirmed.[16]

Affirmed.

---

[15] An example of a bus driver owing, and potentially breaching, an ordinary duty of care to a former passenger is found in *Johnson v. Bi-State Dev. Agency*, 793 S.W.2d 864, 867 (Mo. 1990). The plaintiff was a former passenger who successfully exited the bus and moved to cross the street in front of the bus. "The bus driver looked in his rear view mirror then motioned with his hand to cross the street." *Id.* As the plaintiff stepped from in front of the bus, she was struck by a passing car. The court ruled that whether the bus driver's actions breached the ordinary duty of care was a question for a jury.

[16] KRT has asserted a cross-assignment of error, and essentially contends that KRT is absolutely immune from Ms. Hayes's suit. We decline to discuss these assertions.